# WHEELING.

## TOMLINSON v. NICKELL.

Submitted January 24, 1884—Decided April 19, 1884.

1. A testator by his will devised all the remainder of his lands to his son and then added : "If my son should die without having heirs he shall divide the land between his sisters' heirs as he may think proper." HELD:

   I. This gave to the son a defeasible fee simple in this land. (p.157.)

   II. It was defeasible, and his estate in it terminated when he died leaving at the time of his death no heirs of his body, the word heirs first used in this clause of the will meaning "heirs of his body." (p. 158.)

   III. The word heirs used in the latter part of this clause: "He shall divide the land between his sisters' heirs," is to be interpreted in its usual and technical sense, and means such persons as at the death of each of his sisters respectively would be her heirs ; and it will not bear the interpretation of the children of the sisters living at the death of this son without heirs of his body. (p. 161.)

2. The son named in this will having died without heirs of his body living at the time of his death, and his fee simple estate being thus terminated and passed to others as a shifting devise, and one of his sisters (there being three of them) being then dead leaving children, who were then living, and his other two sisters being alive and he having failed to execute the power of dividing the land among his sister's heirs. HELD:

I. The children of the deceased sister as her heirs became on the death of this son of the testator entitled to one undivided third part of the land in fee simple, their interest in it being equal; its division among them must be made per capita.

II. The remaining two undivided parts of this land passed by inheritance to the heirs of the testator, one undivided part thereof to be held by them for the life of one of the surviving sisters and on her death to go in fee simple to the persons, who might at her death be her heirs, and the remaining undivided part of •this land to be held by the heirs of the testator·for the life of the other surviving sister and on her death to go in fee simple to the persons, who at her death might be her heirs. (p. 171.)

3. If this son of the testator left a widow surviving him, despite the termination of his defeasible estate in fee by his death leaving no heirs of his body, she would have right to dower in this land, and after the assignment thereof but not before she would have a life-estate in such portion of such land as might be so assigned to her. (p. 160.)

4. If during the lifetime of the son of such testator he conveyed this land to a stranger in fee simple, and his wife united in the conveyance with him, and the deed was duly acknowledged by him and by her after privy examination and duly recorded, the estate of such stranger in this land and in every part thereof would nevertheless terminate, whenever this son of the testator, his grantor, might die leaving no heir of his body surviving, as the fact, that the wife united with her husband in such deed to the stranger, could under such circumstance convey to such stranger no estate in any portion of this land, as she had no estate in•it vested or contingent, but a mere incohate right of dower, which is not an estate; and therefore those, who would on the death of such son of the testator have been entitled to .this land, could in an action of ejectment recover the whole of it from him. (p. 160.)

5. It is a general but not a universal rule, that the same word is to be understood in the same sense, when it occurs more than once in the same will. A well established exception to this rule is that if a word has a technical meaning in the law and is accompanied by a context in one clause, which shows the intention of the testator, that it should not be understood in a technical sense, when used in another clause in reference to a different subject, unaccompanied by anything explanatory of it, the word is to receive in the latter clause its technical meaning. (p. 165.)

GREEN, JUDGE, furnishes the following statement of the case:

At February rules, 1883, in the circuit court of Monroe county the following declaration in ejectment was filed:

"STATE OF WEST VIRGINIA,

"CIRCUIT COURT OF MONROE COUNTY TO-WIT:

"Mary E. Tomlinson, James A. Tomlinson, William H. Tomlinson, John A. Tomlinson, Joseph H. Tomlinson, Alwilda Tomlinson, Mattie J. Tomlinson, Joseph Tomlinson, Catharine Tomlinson and Cora B. Tomlinson, the two last of whom are infants and who sue by David Tomlinson, their next friend, Angeline Stile, Eliza S. Upton, William Leach, John A. Leach, Mary J. Harris, Sarah C. Leach and James W. Vines, John W. Vines, Mary C. Low, Henrietta Alderson, Harvey L. Vines, G. B. Vines, A. Bermen Vines, Sarah F. Vines, Eliza S. Fink and Jane E. Fink, plaintiffs, complain of Samuel W. Nickell, defendant, for this, to-wit, that heretofore, to-wit, on the 20th day of March, 1882, the said plaintiffs were possessed in fee of a certain tract of land lying in the county of Monroe, on the west side of the road leading from Hillsdale to Union, known as the William Dunsmore place, and adjoining the lands of David Tomlinson and others, containing about two hundred and seven acres, and bounded as follows:" (giving a description by metes and bounds) "being the land of which a certain devise was made to J. H. Dunsmore by the will of the late William Dunsmore and by the said J. H. Dunsmore conveyed to the defendant by deed dated March 12, 1872, which said land the plaintiffs claim in fee. And the said plaintiffs, being so possessed thereof as aforesaid, the said defendant afterwards, to-wit, on the 21st day of March, 1882, entered into the premises aforesaid and unlawfully withholds from the plaintiffs the possession thereof, to the damage of said plaintiffs' one thousand dollars. And therefore they bring suit."

The second count was in the name of the above named Tomlinsons as plaintiffs and in it the plaintiffs claimed the one undivided third part of said land in fee. The usual notice was served on Samuel W. Nickell, that this declaration would be filed at February rules, 1882, and that damages would be claimed at the rate of six hundred dollars per annum from March 21, 1882. On March 20, 1883, the

defendant, Samuel W. Nickell, appeared in open court and pleaded not guilty and issue was joined. On the 22d day of March, 1883, all the matters both of law and fact were submitted to the court in lieu of a jury; and on the 6th day of June the court rendered the following judgment:

"This day came again the parties, by their attorneys, and the court being of opinion for the plaintiffs in the first count in the declaration mentioned, and that they have right to the possession of the premises in said count mentioned against the defendant, Samuel W. Nickell, who was in possession thereof and claiming title thereto at the commencement of this action, and that the estate of said plaintiffs in said premises is an estate in fee, and the court being further of opinion that the plaintiffs in the second count of the declaration have no right to said premises to the exclusion of their co-plaintiffs in said first count mentioned, it is therefore considered by the court that the said plaintiffs in said first count mentioned do recover the possession of said premises—that is to say, of the tract of about two hundred and seven acres of land in the declaration mentioned, lying in the county of Monroe, on the west side of the road leading from Hillsdale to Union, known as the William Dunsmore place, adjoining the lands of David Tomlinson and others, being the land conveyed to said Nickell by J. H. Dunsmore, and bounded as follows:" (giving the metes and bounds), "and that the plaintiffs recover against said defendant their costs about the prosecution of their suit expended."

To the foregoing judgment and opinion of the court, the defendant, by his attorney, excepted, and his exception is signed, sealed and ordered to be made a part of the record in this cause, and the written agreement of facts filed is also ordered to be made a part of the record. And the court certifies that said written agreement of facts contains all the facts proven upon the trial. And after the said judgment was pronounced by the court, but before the same was entered, the plaintiffs, by their attorney, announced themselves ready to proceed with the enquiry of damages, notice whereof was filed with their declaration, and offered to submit the same to court. And thereupon the defendant tendered a petition for an allowance for improvements, and ten-

dered therewith a statement in writing of his claim, and demanded that the question of damages for the use and occupation of the land upon the one hand and the question of allowance for permanent improvements on said land on the other, should be tried by one and the same jury; and the plaintiffs objected to the filing of the said petition. But the court being of opinion for the defendant, overruled said objection to the filing of said petition and permitted the same to be filed and ordered that a jury be empaneled to try said questions. Whereupon the plaintiffs claimed that they were entitled to time to prepare for the trial of said claim for improvements, and moved the court to continue the trial of said question until the next term; which motion the court sustained and said trial of said question is continued accordingly. And the execution of the foregoing judgment shall be suspended for sixty days from this date upon the defendant executing and filing with the clerk of this court a suspending bond in the penalty of five hundred dollars, with good personal security, to be approved by said clerk, conditioned according to law.

The agreed state of facts referred to in the foregoing order was as follows:

"It is agreed by the parties to this suit—

"1. That William Dunsmore, having made a will, departed this life in the year 1860, which will was duly admitted to probate by the county court of Monroe county, at its May term, 1860, which will and the certificates thereto annexed, is in the words and figures following, to-wit:

"'I, William Dunsmore, of the county of Monroe and State of Virginia, being weak of body but sound in mind, and having in view the uncertainty of life, make this my last will in the following manner and form:

"'First—I do give to my beloved wife, Sarah Dunsmore, the one third of my lands, including the dwelling-house and all other necessary building for comfort and convenience, and also the house now occupied by James A. Holmes; also the following property, she to have choice of the horses, cows and beds first, two horses, three cows, one sow and seven pigs, the two-horse wagon and harness, one big and one shovel plow, one harrow, with double-trees, one wind-mill, (common make), a sufficiency of grain and meat for her use

for one year, and one third part of the present growing crops, corn shelling machine, one cutting knife and box, one cooking stove and vessels, all the buckets and crockery ware she may select, one cupboard and all the dishes, twelve chairs, one large and small bureau, and one bureau with desk top, two side-tables, one sewing table, one candle and one wash-stand, all the pictures, two mirrors, one clock, two leather trunks, one side-saddle and bridle, all the table cloths, hand towels, bureau and table covers, window blinds and curtains, shovels, tongs and irons, smoothing irons, the large bible and all her own books, the carpeting, two meat barrels, one ten bushel box, half bushel, two four prong forks, one pitch fork, one shovel, one large copper and iron kettle, two washing tubs, one churn, two vinegar barrels, one molasses barrel and its contents, one log chain, two axes and Ruben's axe, iron wedge, four hoes, one mattock, two scythes and cradles, two mowing scythes, two rakes, two sledges, the crop of flax, the hay, fodder and straw for the use of the stock, one loom and all its gearing, three beds and bedding. My black man Ruben is to remain on the place under the control of my wife her lifetime unless she is willing for him to be disposed of sooner. The girl Viney is the property of my wife, and she can dispose of her as she pleases. She is to have the beds and bedding of Ruben and Viney. All the aforesaid property my wife shall have for her own use as long as she remains my widow, and she can at her death make such disposition of said property, if still my widow, as she pleases, except the land and negro boy which will be hereinafter directed.

"'I desire that my lands shall be divided between my two sons, Jacob H. Dunsmore and James A. Dunsmore, as follows:

"'First—I give to my son, James A. Dunsmore, fifty acres on the northeast corner, commencing on the northeast corner adjoining the Parker land, and running south to the passway leading from my house to the Union and Hillsdale road, with the Parker land; then west with the passway sufficiently far as to cut off fifty acres by running a line north to the Parker line, throwing his fifty acres in a square around the house he now lives in. All the remainder of the land, including my wife's third, I give to my son Jacob H. Duns-

more—my wife's third at her death. If my son, Jacob Dunsmore, should die without having heirs he shall divide the land between his sisters' heirs as he may think proper. The land is not to be liable for any debts he has contracted heretofore or hereafter. The piece of land laying between the Union and Hillsdale road and joining the land of David Tomlinson, I desire to be sold as hereinafter directed. I also give my son, Jacob H. Dunsmore, my sorrel mare Potts, one cow, one bed and bedding, his choice after my wife selects hers. I also direct that all my personal property not herein disposed of shall be sold, together with the piece of land before mentioned, upon a credit of twelve months, and that the proceeds arising from the sale of said property, together with the debts due me, shall, after the paying of all my just debts, be divided as follows: First, I give to my son, Charles L. Dunsmore, two hundred dollars, and to my son, William H. Dunsmore, two hundred dollars, and to my three daughters, Mary Leach, Eliza F. Vines and Catharine Tomlinson, each two hundred dollars. Eliza F. Vines's to be for the benefit of herself and heirs specially. If after paying my debts and the amount to my last named five children as directed, if there is any balance left, I wish it to be laid out for the roofing of my dwelling-house, and if there is still a balance I desire it to be given to my three daughters. I also direct that when the black man Ruben is sold, that the money arising from his sale shall be divided equally between my three daughters and my son, James A. Dunsmore. If there is not funds from the sale of land and personal property sufficient to pay my debts and my heirs as directed, they shall, after receiving equal proportion, wait for the balance until the black man is sold.

"'I also direct that James A. Holmes shall remain on the place this present year and put out his spring crop as agreed upon—that is, he is to put the field next Lynch's in oats, the field round his house and the meadow in corn, the black man Ruben to be a constant hand with him in tending and saving the crops now growing and to be put out, and the said Holmes is to have one fourth of the crops now growing and also of the spring crop. The balance of the crops is to remain for the use of my wife and son, Jacob H. Dunsmore.

I desire that my son, Jacob H. Dunsmore, remain on the place and take care of my wife. I give my wife eight meal bags and all the soap. The land I give my son, James A. Dunsmore, is only for his benefit during his life and at his death is for his heir or heirs. I give to my grandson, Robert W. Dunsmore, my grey horse, Charley, in the care of his father. And I do request and appoint Anderson M. Waite and Alexander K. Parker as the executors of this my last will.

"'Given under my hand this 9th day of March, 1860.

"'WM. DUNSMORE.'

"2. That the said Wm. Dunsmore left to survive him a widow, Sarah Dunsmore, and the following children, Lewis Dunsmore, Jacob H. Dunsmore, Catharine Tomlinson, Mary Leach, Eliza Vines, Alexander Dunsmore and Wm. Dunsmore, jr.

"3. That the plaintiffs in this suit are the children of said Catharine Tomlinson, Mary Leach and Eliza Vines, respectively, and the only children that have been born to them, and that all of them were living at the death of said Wm. Dunsmore except Catharine Tomlinson, Cora B. Tomlinson and Jane E. Vines, who were born previous to the death of Jacob H. Dunsmore.

"4. That the widow of said Wm. Dunsmore died about the year 1865.

"5. That Lewis Dunsmore, Eliza Vines, Catharine Tomlinson and Alex. Dunsmore, children of said Wm. Dunsmore, are still living, and the said Mary Leach departed this life in the year 1881.

"6. That William Dunsmore, the younger, died in the year 1882, and left children now living.

"7. That the said Jacob H. Dunsmore died on the 17th day of March, 1882, intestate, leaving to survive him a widow, May C. Dunsmore, who is still living.

"8. That the said Jacob H. Dunsmore never had any child or children, and none have been born to him since his death, and that he never made any division of the land devised to him by Wm. Dunsmore.

"9. That the land devised to said Jacob H. Dunsmore by said Wm. Dunsmore was conveyed by the said Jacob H.

Dunsmore, and May C., his wife, to the defendant, Samuel W. Nickell, on the 12th day of March, 1872, by deed which was admitted to record in said county on the 16th day of March, 1872, which deed and the certificates thereto annexed are in the words and figures following, to-wit : "

(This deed was dated March 12, 1872, and was duly admitted to record of March 16, 1872, it having been regularly acknowledged by the wife after a proper privy examination, the certificate of her privy examination and acknowledgement being in due form.)

"10. That the land so devised to and conveyed by said Jacob H. Dunsmore was in possession of the latter at the time of said conveyance, who claimed the same under the said will of Wm. Dunsmore; that the said Nickell took possession of the same under the said deed and still holds the same, claiming under said deed, and that this is the same land claimed and described in the plaintiffs' declaration in this case.

"11. That the said Nickell paid the said May C. Dunsmore two thousand six hundred dollars for uniting with her said husband in the conveyance aforesaid."

· (The petition referred to was that by the defendant, that he be allowed for permanent and valuable improvements put upon this land. I deem it unnecessary to state its contents.)

The defendant, Nickell, obtained from a judge of this Court a writ of error and *supersedeas* to this judgment of June 6, 1883.

*Campbell & Hereford* and *A. F. Mathews* for plaintiff in error.

*J. W. Harris* and *A. C. Houston* for defendants in error.

GREEN, JUDGE:

The question involved in this case is the true interpretation of the following clause in the will of William Dunsmore of Monroe county: " All the remainder of my land, including my wife's third I give to my son Jacob W. Dunsmore—my wife's third after her death. If my son Jacob Dunsmore should die without having heirs, he shall divide the land between

his sister's heirs as he may think proper." To whom does this land devised to Jacob H. Dunsmore now belong upon the facts agreed in this case? First, what was the estate, which under this clauss Jacob H. Dunsmore took in the land upon the death of the testator, William Dunsmore, his father? This must depend upon the true meaning of the words "*if my son Jacob Dunsmore should die without having heirs, he shall divide the land*" in a specified manner. Whatever construction be given to these words, it is obvious that Jacob H. Dunsmore had on the death of his father, the testator, a defeasible fee simple in this land devised to him; for it is devised to him without any words of limitation. The language of the will is "*I give the land to my son Jacob H. Dunsmore.*" This language was a devise of the land to Jacob H. Dunsmore in fee simple. (See Code of Va. of 1860, ch. 116 § 8, p. 559). But it is obviously made a defeasible fee simple by the words immediately following: "*If my son Jacob Dunsmore shall die without having heirs, he shall divide the land*" among certain parties specified. Upon the occurring of the event here specified "*Jacob Dunsmore dying without having heirs*" his fee simple estate before granted was terminated and by an *executory limitation* is shifted to others as a *shifting devise.*

The next enquiry is: What was the contingency according to the testator's will, on which the fee simple estate in this land devised to his son Jacob H. Dunsmore was thus to terminate and shift to others? The words of the will are: "*If my son Jacob Dunsmore should die without having heirs.*" If this language is construed according to its technical meaning, the contingency, upon which Jacob H. Dunsmore's fee simple estate in this land was to terminate, and the fee shift to others, has never happened. So far from dying "*without having heirs*" he died having very many heirs, all the plaintiffs in this action and many others. But did the testator in this phrase, "*without having heirs,*" mean to use the word "*heirs*" in its technical meaning, or did he mean by the word heirs as here used "*heirs of his body?*" If he meant "*heirs of his body,*" then as his son did die "*without having heirs,*" and his fee simple estate was terminated by his death, the fee shifted to others by the terms of the will. Now the testator, when he used the words "if my son Jacob Dunsmore

should die without having heirs he shall divide the land be-
tween his sisters' heirs as he may think proper," clearly and
obviously meant, "if he should die without having heirs of
his body." For it would be an evident absurdity to suppose
that the devise over to his sisters' heirs should be made to
depend on the death of Jacob H. Dunsmore without heirs,
as this could not be the case so long as his sisters had heirs,
for their heirs could always be his heirs, if he had no others.
If therefore the testator meant the devise to J. H. Dunsmore's
sisters' heirs should take effect only in the event of their
brother's death without heirs, the conclusion must be that
the testator under no circumstances intended, that these heirs
of Jacob H. Dunsmore's sisters should have any interest in
this land, which conclusion would be a positive contradiction
of the words of the will. All this absurdity can be avoided
by construing the words, "*without having heirs*" to mean
"without having heirs of his body." Accordingly it has been
uniformily held from the earliest times, that "when real estate
is devised over in default of *heirs* of the first devisee, and the
ulterior devisee or devisees stands related to the prior devisee,
so as to be in the course of descent from him, whether in the
lineal or collateral line and however remote, the word heirs,
the wanting of which by the first devise is to be the contin-
gency on which the devise over is to take effect, will always
be construed to mean 'heirs of the body;' but if the devise
over is to a stranger then the word 'heirs' would be given its
usual technical meaning."

In *Law* v. *Davis*, 2 Stra. 850, the court say: "So if a devise
be to A. and his heirs and for want of heirs to B., the brother
of A., these last words restrain the word heirs to mean only
'heirs of his body' because it is impossible that A. can want
an heir general while he has a brother." It would obviously
be otherwise if B. was in no way related to A. but a stranger.

Very many cases of this character have been decided in
the same manner and for the same reason. See *Parker* v.
*Thacker*, 3 Lev. 70; *Webb* v. *Hearing*, Cro. Jac. 415; *Lyte* v.
*Willis*, Cas. temp. Talb. 1,; *Allen* v. *Spendlove*, 1 Freem. 74;
*Pickering* v. *Towers*, Amb. 363; *Ives* v. *Legge*, reported in
note 3 T. R. 488; *Doe on Dem. Comberbach* v. *Sir R. Perryn*,
3 T. R. 484; *Nottingham* v. *Jenkins*, 1 P. Wms. 23; *Goodright*

v. *Goodridge*, Willes 369; Gibbs, C. J., in *Hatch* v. *Bluck*, 6 Taunt. 485; *Aumble* v. *Jones*, 1 Salk. 238; *Attorney-General* v. *Gill*, 2 P. Wms. 369; 1 Cowp. 234. I know of no authority in opposition to these decisions.

My conclusion therefore is that Jacob H. Dunsmore under the clause of his father's will took clearly not an absolute fee simple but only a defeasible fee simple in the lands so devised to him. His fee simple estate terminated and was shifted to others, "when he died without having heirs of his body," which is admitted to be the fact. Of course therefore his grantee, Samuel W. Nickell, had no estate whatever in the land in controversy, unless he acquired some estate from the fact that the wife of Jacob H. Dunsmore, united with her husband in the deed of March 12, 1872. Had she then any estate either vested or contingent in this land to convey? She clearly had not. If her husband had had a fee simple absolute in the land, she would have had no estate in it vested or contingent which she could convey. A wife during the life of her husband can never have any estate of any sort in her husband's lands. What she has is a contingent right of dower in his lands, which he holds in fee simple. But this is no estate. It is contended by the counsel for the plaintiff in error, that it is equivalent to a contingent estate for life in one third of his fee simple lands provided she outlives her husband. But this is clearly a mistake. For upon the death of her husband, if she had such contingent life-estate in one third of his lands, it would immediately vest in her by operation of law; but it does not vest in her, for all the land held by her husband in absolute fee on his death vests in his heirs in fee simple. It is true it is the duty of the husband's heirs to assign to her dower, that is, to set off to her one third in value of her husband's fee simple lands which have descended to his heirs, this third to be held by her for life. Not until this assignment is made does the widow have any estate in her husband's lands. If he does not perform this duty, she may bring a suit and compel the laying off of such dower by metes and bounds to be held by her for life. So that in her husband's life-time she really has but a possible future right to have laid off to her one third in value of his lands which he holds in fee; and this

right extends not only to the lands, which during the marriage he held in absolute fee, but also to all lands held by him during the marriage in fee simple, though his fee in them may have been a defeasible fee simple, which so far as the interest of the husband in them may have been defeated, and his estate terminated by his death, and his lands by a shifting devise on his death have gone to others. Even in such case the estate is, as it were, extended so as to allow to the widow a right to have laid off to her one third in value of such lands as her dower to be held by her for life. See *Jones et ux.* v. *Hughes*, 27 Gratt. 560, and *Medley* v. *Medley*, 27 Gratt. 568.

But this right to have dower laid off to her in her husband's lands, in which he had during the marriage a defeasible estate in fee simple, constitutes during the lifetime of her husband or even after his death, till this dower was actually assigned to her, no estate of any kind in his land; hence the fact that she united with her husband in a deed to a third party conveying land, in which her husband had such defeasible fee simple, which, it so happened, terminated at his death, could not possibly confer on such party any estate in the land or in any part of it after her husband's death, for she had no estate contingent or vested to convey. This was expressly so decided in *Corr* v. *Porter*, 33 Gratt. 278. Judge Staples in delivering the opinion of the court in that case goes still further, as I understand him, and says in effect, that the fact, that the wife united with her husband in a deed conveying land, in which her husband had such defeasible estate, confers on the vendee no rights of any character but simply operates to prevent her from setting up any claim to dower after her husband's death; and that the purchaser acquires no rights legal or equitable. But so far as he states in substance that the fact, that the wife unites with her husband in such deed conferred on the vendee after the death of the husband, no equitable rights of any sort to the value of what would have been her dower interest in this land or any other right, is merely an *obiter dictum;* and, I must confess, his reasoning on this matter is not very satisfactory. The views taken by Scribner in his work on Dower, vol. 2 pp. 5, 8, when speaking of inchoate dower as a right of property is

to my mind much more satisfactory than what is said by Judge Staples. But as I am satisfied, that the fact that Dunsmore's wife united with him in the deed, whereby this land was conveyed to Samuel W. Nickell, conferred on Nickell no sort of estate in any part of this land after her husband's death, it is unnecessary of course in this case to consider, whether it conferred on him any equitable right. Judge Staples evidently thinks it did not. He may be right; but I am not now prepared to say that he is, and I therefore express no opinion on the subject.

The next enquiry is: Was the legal title to the whole or any part of the lands in controversy in the plaintiffs or in any of them? The answer to this enquiry depends upon the construction given to that portion of William Dunsmore's will, which directed in the contingency, which did happen, "that Jacob H. Dunsmore should divide the land between his sisters' heirs as he may think proper." This was a power coupled with a trust. The rule is thus laid down in *Milhollen* v. *Rice*, 13 W. Va. 510, point 7 of the syl.: "If the devisee of a life estate is simply authorized to dispose of the property at her death among a certain definite class as she may think proper this will be held to be a power in the nature of a trust, unless it otherwise appears from the will, that the duty to execute such power to be inferred from its being granted, was designed by the testator to be left to be performed or left unperformed at the option of the party on whom such power was conferred. The rule being, that when there appears a general intention in favor of a class and a particular intention in favor of individuals of the class, and the particular intention fails from that selection not being made, the court will carry into effect the general intention in favor of the class."

The whole question, in case a power is given to one, who has a life estate, to dispose of the fee to a class of persons to be divided among them as the life-tenant may think proper, as to when it is to be considered as a power coupled with a trust or when it is to be regarded as not coupled with a trust is fully discussed in this case of *Milhollen* v. *Rice*, the discussion of the question extending from page 543 to 566. The authorities are there fully reviewed; and from them and

from the conclusion reached by the court, as contained in the portion of the syllabus above cited, I conclude that the authority conferred by the will of William Dunsmore on his son, Jacob H. Dunsmore, in case he should die leaving no heirs of his own body, to divide the land, which he had given him, among the heirs of his sisters in such way as he might think proper, was a power coupled with a trust; and that the testator desired this division under these circumstances to be made by his son among the heirs of his three sisters, and did not wish these lands to descend in fee simple to all the heirs of the testator. And to whom this land should go, whether to all his heirs or only to the heirs of his three daughters, the testator did not design to be left to the judgment or option of his son, Jacob Dunsmore. All that he intended, should his son leave no heirs of his own body, was that his son should divide the land among such of his sisters' heirs as he might select and in such proportions as he might choose. But he did not intend to leave to his judgment in effect to decide, whether he should by leaving this power unexecuted confer a large portion of the estate on persons other than the heirs of these three sisters of Jacob H. Dunsmore. It was a power given to him coupled with a trust, which it was his duty to have executed. The language of the will, that "*if his son should die without having heirs*" (meaning heirs of his body) "*he should divide this land among the heirs of his sisters as he might think proper*" shows clearly, that the testator did not intend to leave it optional with his son to decide, whether this land in such a contingency should go ultimately to the heirs of the testator generally or should go to or among the heirs of his three daughters. This question the testator intended to decide for himself and did by his will decide, that in such contingency this land should go ultimately to or among the heirs of these three daughters of the testator. When a trust of this character is created, the courts of the present day and those for a long time past construe the bequest or devise as a gift by implication to the objects of the power in default of the power being exercised, and the property will be regarded as given or devised to each individual of the class equally, and each will be regarded as holding directly under the terms of the will; the power con-

ferred is regarded as extending only to the selection from or distribution amongst the class of objects, and if the power is not exercised the estate goes to each member of the class equally. See Lord Elden's remarks in *Brown* v. *Higgs*, 8 Ves. 576; *Kemp* v. *Kemp*, 5 Ves. 849; *Witts* v. *Boddington*, 3 Bro. C. C. 95; *Maddison* v. *Andrews*, 1 Ves. 57; *Longmoon* v. *Brown*, 2 Ves. 124; *Whitehurst* v. *Harker*, 2 Ired. Chy. 292. But when the division is to be made among several classes it does not follow, that in default of the exercise of the power the estate will always be divided among all the members of the several classes equally *per capita*; but of this we will speak more at large presently.

But we must consider first, whether the division, the power to make which was given to the son of the testator but not exercised by him, was a division among the members of one class only, that is to say, the children of these sisters of this son, who might be living at his death, as the court below has decided in effect, or was it a division to be made among three distinct classes, that is the heirs of these three sisters severally. This last is apparently the meaning of the testator, if we give to the language he has used its usual and technical meaning. His words are: "He *shall divide the land among his sisters' heirs.*" The word heirs must receive its usual and technical meaning, unless the context *clearly* indicates, that the testator used the word in some other sense. There are a number of cases, in which it has been held, that the will *clearly* showed that the testator used this word *heirs* in some other than its technical sense. Thus if the devise is a present one to take effect immediately on the death of the testator, and is to the heirs of a person known to the testator to be living, as such a devise could not possibly take effect immediately on the testator's death, as the ancestor would be living, and no one can be the heir of a living person, this would show clearly that the testator by making a devise to the heirs of such living person to take effect at once did not use the word *heirs* in its technical sense but used it as the equivalent of *heirs apparent*, and hence in such case the heirs apparent of such person would immediately on the death of the testator take the estate devised to the heirs of such living ancestor, as the testator's clearly

expressed will could in no other manner be carried out. But this reasoning has no application to the case when the devise, as in the case now before us, is not a present or immediate devise to the heirs of a person known to the testator to be living, but is a limitation of a future estate to the heirs of such living person or persons to take effect after the termination of some preceding estate. In such case there is no necessity to construe the word *heirs* as *heirs apparent* in order to effect any expressed purpose of the testator. The strict legal signification of the word *heirs* can be attached to it as used by the testator, and yet the purposes expressed by him be fully carried out. For in such case, as in the case before us, the estate devised to the heirs is not intended to vest or come into possession till the termination of some present estate created by the same will; and giving to the word *heirs* its usual legal signification, the testator's will is not as in the other case necessarily defeated. For though the party, whose heirs are given such future estate, be living, yet he may die, before the particular estate ends, and must die at some time, and whenever he does die, his heirs will be in existence to receive the future estate intended by the will to be devised to them to take effect at a future time. See *Reid* v. *Stuart*, 13 W. Va. 338; *Campbell* v. *Rawdon*, 18 N. Y. 412; *Criswell's Appeal*, (5 Wright) 41 Pa. St. 288; *Richardson* v. *Wheatland*, 7 Metc. (Mass.) 169.

In the case before us the devise intended for the benefit of the heirs of the three sisters of Jacob H. Dunsmore was not only a devise to take effect *in futuro*, but that it would ever take effect at all was contingent upon the death of Jacob H. Dunsmore without heirs of his body. According therefore to these authorities, the words "*divide the land between his sisters' heirs*" must be regarded as having their usual signification; and the object of the testator's bounty must be regarded as the three classes, the heirs of the three sisters of Jacob H. Dunsmore, the word *heirs* receiving its usual technical meaning, that is, such persons as would on the death of each of the sisters severally be the heirs according to the law in force at the time of their several deaths. But it is argued by the counsel for the defendant in error, that the will shows clearly on its face that the testator by using these words "*the heirs

*of his sisters*" did not mean what his words import, but that
he meant the children of these three sisters, whether any or
all of the sisters were living when this estate was to vest in
the devisees, that is, at the death of their brother, Jacob H.
Dunsmore, without heirs of his body. This, it is claimed,
is shown to have been the meaning of the testator, because
he repeatedly used this word "*heirs*" in the will and always
obviously meant not the *heir* proper of the ancestor named
but the children of such person, though he was still living.
It is true, that the testator had obviously used this word
*heir* in this improper sense as meaning children, but he has
not done so uniformly, as is claimed. In one place for in-
stance he says, that two hundred dollars which he had given
to Eliza Vines, one of his married daughters, was "to be for
the benefit of herself and heirs specially." It is difficult to
say what the testator meant by this language. I suspect he
meant, that this legacy was to be for her *sole* and *separate*
use, but if so, he has expressed his meaning so imperfectly,
that the courts could never give effect to his supposed mean-
ing; certainly this very inaccurate expression could not aid
in the interpretation of any other portion of his will. Again
he says: "If there are not funds from the sale of land and
personal property sufficient to pay my debts and my *heirs* as
directed, they shall, after receiving equal proportions, wait for
the balance till the black man is sold." By the word *heirs*
as used in this sentence, the testator evidently meant not his
*heirs proper* nor his *heirs apparent* nor all his *children*, but only
Charles L. Dunsmore, William H. Dunsmore and his three
daughters, five of his children to each of whom he had given
two hundred dollars. Again the testator says: "The land I
give my son, James A. Dunsmore, is only for his benefit
during his life, and at his death is for his *heir* or *heirs*." I
see in this clause no reason why the word *heir* or *heirs* should
be construed to mean *child* or *children*. There is no indica-
tion, that the testator intended to give to these words any
other than their usual and *technical* meaning; and I feel quite
sure that his will would be much better interpreted, by giving
to these words their usual and technical sense than by first
surmising, that the testator had some other meaning and
then carrying out this supposed purpose.

Let us suppose for instance, that the only descendent of James A. Dunsmore living at his death was a grand-child. If we give to these words of the will their usual and technical sense, this grand-child would receive the whole of the land left by this will to his grand-father. Can any one doubt that this would accord with the wish of the testator? If however the construction insisted on by the counsel of the derendant in error should be given to the word *heir* or *heirs,* as here used, this grand-son would get but one fifth of the grand-father's lands, and all the balance would go to his grand-uncles or grand-aunts and their numerous decendants, *heirs* of the testator. I cannot believe that this would be in accord with his will. The word *heirs* is used nowhere else in this will except in the clause, which we are construing, which is: "If my son, Jacob H. Dunsmore, should die without having *heirs* he shall divide the land between his sisters' *heirs* as he may think proper." Now we have seen that the word *heirs* when first used in this sentence does not mean *children,* but does mean *"heirs of his body,"* and this is entirely different from the word children in this connection. Suppose for the words, *"heirs of his body"* we were to substitute *children* and make this sentence read, as the counsel of the defendant in error would have it read: "If my son Jacob H. Dunsmore should die without having children, he shall divide the land between his sisters' heirs as he may think proper;" and suppose that he had children all of whom died before Jacob H. Dunsmore, thus leaving him no descendants. Still the condition, on which the fee simple given to Jacob H. Dunsmore was to terminate, and a shifting devise arise putting the fee simple of these lands in the heirs of the sisters of Jacob H. Dunsmore, would not have occurred, and he would have had in such case, an absolute estate in fee simple in this land in obvious violation of the wishes of the testator. On the other hand, if it were said that this will ought to be interpreted so that his fee simple estate would terminate, if he did not have children living at his death, were it possible to so construe the will it we interpret this word as meaning children it would not help to carry out the testator's meaning. For if Jacob H. Dunsmore had a child, who died during his father's lifetime but left a child, a grand-child of Jacob H.

Dunsmore, it is obvious that, according to the testator's will the fee simple of the estate of Jacob H. Dunsmore ought not to terminate at his death. Yet if this word *heirs* is to be interpreted as meaning *children* it would terminate, and the *heirs* of the three sisters would get this land to the total exclusion of the grand-son of Jacob H. Dunsmore. There could not be a more obvious violation of the testator's wishes. But giving to this word *heirs* as used by the testator in the first part of this clause, which we are interpreting, its usual technical meaning modified only to the extent that it has been under such circumstances modified by the uniform decisions of the courts so as to make it read, if "Jacob Dunsmore dies without heirs of his body he shall divide," &c., we avoid all these glaring violations of the testator's wishes in the contingencies we have supposed, which when the testator's will was written were quite likely to occur.

My conclusion therefore is, that we cannot find in this will any such uniform meaning attached by the testator to the word "*heirs*" as will give us any aid in determining what he meant, when he directed in a certain contingency "this land to be divided among the heirs of the sisters of Jacob H. Dunsmore." But in truth if we had found that in all the other clauses of this will, except the one we are construing, the word heirs was uniformly used by the testator as synonymous with the word *children*, yet we could not for that reason attach that meaning to it in this cause. For as was well said by the supreme court of Alabama in *Lloyd* v. *Rumbo*, 35 Ala. (new series) 712, Chief Justice Walker delivering the opinion of the court, "The word *heirs* occurs in a clause preceding and in one succeeding the sixth; and it is argued, that the words in those clauses must mean children, and that the testator must be supposed to have used the word in the same sense in the sixth clause. It is a general, but not a universal rule, that the same word is to be understood in the same sense, when it occurs more than once in the same will. A well established exception to this rule is, that if a word has a technical meaning in the law, and is accompanied by a context, in one clause, which shows the intention of the testator that it should be understood in a different sense, while in another clause it is used with reference to a different sub-

ject, being accompanied by nothing explanatory of it, the word is to receive in the latter clause its technical meaning. *Flinn* v. *Davis*, 18 Ala. 122; *Doe d. Cadogan* v. *Ewart*, 7 Ad. & E. 636 (34 Eng. Com. L. R. 187); *Streetford* v. *Buckley*, 2 Ves. Sr. 170, 181; *Doe d. Chattaway* v. *Smith*, 5 M. & S. 126, 131; *Sheffield* v. *Orrery*, 3 Atk. 282, 288; *Forth* v. *Chapman*, 1 P. Wms. 664; 2 Williams on Ex'or 928; 2 Lomax on Ex'or (marg.) 76; *Mazyck* v. *Vanderhorst*, 1 Bailey's Eq. 48; 2 Jar. on Wills 419."

The rule thus laid down might perhaps have been laid down somewhat broader, and might have required perhaps the technical meaning to be given to a word, where there was nothing to show a contrary purpose except the use of the same word in a non-technical sense in other clauses of the will or even in the same clause of the will. But as laid down it covered the case before the Alabama supreme court, as it covers the case now before us. One other objection however is urged by the counsel for the defendants in error to giving to the words in the clause we are discussing "*his sisters' heirs*" the usual technical meaning; and that is, that Jacob Dunsmore, the son, if he should die without leaving heirs, was to divide the land between his sisters' heirs. And it is said that this must have meant his sisters' children, as he could not have divided this land among persons then not born perhaps, and certainly not known if any of his sisters were still living. This view seems to me to be without force. It is obvious, that this will intended that the testator's son, Jacob H. Dunsmore, should divide this land by his will, as it is clear the division under no circumstances could take effect till after his death; for the contingency, on which it was to take effect was, "If Jacob II. Dunsmore should die without heirs of his body" which of course could not occur till his death. Now I see no sort of difficulty in Jacob Dunsmore dividing this land by his will among "the heirs of his sisters, as he might think proper," whether all of the sisters were dead or some of them were living. Of course if they were all dead when the will was written by Jacob H. Dunsmore dividing this land, there would be no difficulty in making such division. And I can see no difficulty in Jacob H. Dunsmore making the division of this land as he might

think proper by will, though some of his sisters were living. Could he not by will if he chose, have given to the heirs of any of his living sisters on her death any portion of his land he pleased, as a fourth or a half? Could he not have given such fourth or half to the male only or to the female heirs only of his sister on her death? Could he not have given what portion he pleased to the eldest heir of his sister on her death, or, if he chose, to the youngest heir? In short could he not by his will have divided this land among the heirs of his sisters in any manner he might think proper though some or all of them were living, when he made his will? I can see no kind of necessity to interpret the words "*his sisters' heirs*" as meaning the children of his sisters living at the death of their brother, Jacob H. Dunsmore. The court below by the judgment it rendered seems to have so interpreted this will, and as a legitimate consequence rendered a judgment in favor of all the plaintiffs, who were all the children of these three sisters living at the death of the brother, Jacob H. Dunsmore. This judgment is based on the idea, that the objects of the testator's bounty were all the children of these three daughters of the testator; and this being the view of the court, it properly held that the devise was by implication to all these children, the objects of the power conferred, in default of its being exercised. If the words "*his sisters' heirs*" mean as the court below appears to have construed them "*his sisters' children*," then this land on the death of the son, Jacob H. Dunsmore, would at once have gone to the twenty-six children of these sisters then living to the exclusion of all the children born subsequently. For it is settled, that when a particular interest is carried out with a gift over to the children of another person, such gift will embrace not only the objects living at the death of the testator, but all who may subsequently come into existence before the period of distribution, but will not include any person, who comes into existence after the period of distribution. See *Ayton* v. *Ayton*, 1 Cox 327, and various other authorities referred to in 2 Jar. on Wills 156. This of itself is a very strong reason why the words "*heirs of his sisters*" used in this will should not be interpreted as *children* of his sisters.

The testator died in the spring of 1860. Of course there-

fore all the children of his three daughters, who were under age when this suit was brought in February, 1883, were born after February, 1863, or nearly three years after the testator's death.   Two at least of the children of Catharine Tomlinson, one of these daughters, that is Catharine Tomlinson and Cora B. Tomlinson would, if the heirs of these three daughters are interpreted to mean children of these three daughters, have been excluded from all interest in this land had the son of the testator, Jacob H. Dunsmore, died within two years after the death of the testator, though because of his happening to live longer they are not excluded; and so too all the children who might be born to any of these three daughters after the death of their brother, Jacob H. Dunsmore, would have to be excluded, if by *"his sisters' heirs"* is meant his sisters' *children.*   It would seem to be a singular interpretation of this will, which would lead to such results.

By the heirs of his sisters it seems to me was obviously meant the immediate families of the sisters' children and descendants living at the death of the sisters.   And thus the technical and usual interpretation of this word heir prevents the exclusion from the testator's bounty of any of the children, who might be living at the death of their mother, one of these sisters, whether he or she happened to be born after or before the death of Jacob H. Dunsmore; and it can scarcely be believed, that the testator meant to make any distinction between children born to these sisters before and those who were born after the death of Jacob H. Dunsmore, for no reason can be conceived why he should make such a distinction.   But as I interpret this will, all such injustice and all unreasonable distinctions not dreamt of by the testator are avoided.   For of course none of the shares or interest in this land, on the contingency which has happened, the death of Jacob H. Dunsmore without leaving heirs of his body living at his death, could vest till the death of one of these three sisters.   One of these sisters, Mary Leach, died in 1881 about a year before Jacob H. Dunsmore died, and therefore one third of this land on the death of Jacob H. Dunsmore, leaving no heirs of his body went under the will of Wm. Dunsmore, the testator, to the heirs of Mary Leach in fee simple, who were a number of children, whom she left living at her

death. They got this one undivided third of this land in controversy in fee simple under this will, simply because they were the heirs of their deceased mother, Mary Leach, and they got just such interest, as they would have inherited, had she and her two other sisters owned this land in fee simple; and this follows from the land being devised to the heirs of these sisters respectively. The *heirs* of these three sisters do not, as we interpret this will, take in their own right, but only as representing their respective mothers, the daughters of the testator; and this being the case, they should take it as it were *per stirpes*, that is, the shares which their mothers would have taken had the land been devised to them in fee simple, and not *per capita*, as they would have taken had the land been devised to the *children* of these three sisters instead of to the *heirs* of these three sisters. See *Wythe* v. *Thurlston*, 2 Amb. R. 554; *Gale* v. *Bennett*, 2 Amb. R. 681; *Rowland* v. *Gorsuch*, 2 Coxe's Cases in Equity 187, 189.

The next enquiry is, as but one of these sisters was dead when this suit was instituted, and her children could claim but one undivided third part of the land in controversy in fee simple, and as no interest in this land belonged to the defendant below, Samuel W. Nickell, after the death of his grantor Jacob H. Dunsmore, leaving no heirs of his body, and as the other sisters, Catharine Tomilson and Eliza Vines, were still living and could therefore have then no heirs, where was the legal title to the remaining two undivided third parts of the land in controversy? As under the condition of things, which has arisen since the testator's death, there was no one, in whom more than one third part of this land could vest on the death of Jacob H. Dunsmore leaving no heirs of his body, and as the remaining two undivided third parts of this land are not disposed of by this will till the death of the two sisters surviving, Catharine Tomlinson and Eliza Vines, as a matter of course these two undivided third parts of this land on the death of Jacob H. Dunsmore leaving no heirs of his body descended to the heirs of the testator, Wm. Dunsmore, that is, as I understand, to Louis Dunsmore, Eliza Vines, Catharine Tomlinson, J. A. Dunsmore, the children of Mary Leach, deceased, and the children of Wm. Dunsmore, deceased, one undivided third part to be held by them till the

death of either Catharine Tomlinson or Eliza Vines, when it is to go in fee simple to those who may then be her legal heirs, and the other part to be held by them till the death of the survivor of these two sisters, then to go to those who may then be her legal heirs.

The judgment of the circuit court of Monroe county rendered on June 6, 1883, must therefore be reversed, set aside and annulled; and the defendants in error must pay to the plaintiff in error his costs in this Court expended; and if by the agreed state of facts it was possible for this Court to determine, who among the plaintiffs were the heirs of Mary Leach, deceased, this Court would render a judgment in their favor for one undivided third part of the land in controversy to be held by them in fee simple, and would act upon and determine what further, if anything, should be done under the petition of Samuel W. Nickell to be allowed for his permanent improvement on this land. But as the agreed facts do not show who are the heirs of Mary Leach, deceased, they are too imperfect to enable this Court or the circuit court to render any judgment in the case, and the agreed facts must be set aside and the case remanded to the circuit court for further proceedings. We suppose that Wm. Leach, John A. Leach and Sarah C. Leach, plaintiffs below, are children of Mary Leach, but we cannot be assured merely from their names, that Sarah C. Leach is a daughter of Mary Leach, deceased. As for all we can know from the agreed facts she might be a daughter of Catharine Tomlinson or Eliza Vines, who had married some one named Leach. So we may suppose that Angeline Style, Eliza S. Upton and Mary J. Harris, are daughters of Mary Leach, deceased. But we have no ground for so surmising, except simply because the position of their names in the declaration is either with or near that of others, who are Leaches. Of course we could not assume this important fact from this mere position of their names in the declaration. It is not among the facts agreed, as if true, it should have been, in order to enable this Court to render any judgment in their favor. The agreed facts must be set aside as being too indefinite to permit any judgment to be rendered on them; and the case must be remanded to the circuit court of Monroe county to be pro-

ceeded with according to the principles laid down in this opinion, and further according to law.

We express no opinion in reference to the petition filed by Samuel W. Nickell relating to permanent improvements put on this land by him. It is obvious that his right to file this petition in the manner, in which he did was based on the fact that a judgment for this land had been rendered against him by the court; and as this judgment must be reversed and set aside, this petition must therefore be stricken from the files, and the order permitting it to be filed set aside. After a proper judgment has been rendered in this case by the circuit court of Monroe county, this petition may be again presented, and must then be dealt with as the circuit court deems proper; but as the plaintiffs may file with their declaration, if it is not to be regarded as already done, a statement of the profits and other damages, they mean to demand under § 30, ch. 90 of the Code, and the defendant may under § 32 same ch. file his claim for improvements, there may be no occasion for defendant to prosecute this action again. We say nothing about this petition now, except that if the ultimate judgment or claim of the plaintiff below should be only for an undivided third part of this land, as belonging to the heirs of Mary Leach in fee, and it should be held that the defendant Samuel W. Nickell is entitled to be compensated for his permanent improvements, he could claim to charge against the heirs of Mary Leach only one third part of these improvements, if that be the extent of their claim to this land.

REVERSED.   REMANDED.